IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIFANY RAE SMOOT,                              )    CASE NO.  5:22-CV-01235-JDG
                                               )
                   Plaintiff,                  )
                                               )    MAGISTRATE JUDGE
        vs.                                    )    JONATHAN D. GREENBERG
                                               )
COMMISSIONER OF SOCIAL                         )
SECURITY,                                      )
                                               )    **MEMORANDUM OF OPINION AND**
                   Defendant.                  )    **ORDER**
                                               )

Plaintiff, Tifany Rae Smoot ("Plaintiff" or "Smoot"), on behalf of minor D.L.J., Jr., challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is **AFFIRMED.**

## I.    PROCEDURAL HISTORY

In November 2019, Smoot filed an application for SSI on D.L.J.'s behalf, alleging a disability onset date of November 1, 2019, and claiming D.L.J. was disabled due to ADHD, learning disability, ODD, speech therapy, and asthma.  (Transcript ("Tr.") at 94, 150.)  The application was denied initially and upon reconsideration, and Smoot requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 94.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On March 18, 2021, an ALJ held a hearing, during which D.L.J. and Smoot, represented by counsel, testified.  (*Id.*)  On May 5, 2021, the ALJ issued a written decision finding D.L.J. was not disabled.  (*Id.* at 94-115.)  The ALJ' s decision became final on May 9, 2022, when the Appeals Council declined further review.  (*Id.* at 1-9.)

On July 13, 2022, Smoot filed a Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10-12.)  Smoot asserts the following assignment of error:

> (1) The ALJ's functional equivalence analysis is not supported by substantial evidence as Claimant has marked limitations in acquiring and using information and attending and completing tasks as supported by the evidence of record including the opinions of those who have interacted with Claimant.

(Doc. No. 1.)

## II.  EVIDENCE

### A.  Relevant Medical Evidence[2]

On December 26, 2018, D.L.J underwent an Initial Comprehensive Assessment with Elisa Hershey, LPCCS.  (Tr. 347, 356.)  Smoot reported D.L.J. was having behavior problems, acting out, and misbehaving at school; while the issues had improved some, it was bad for a while.  (*Id.* at 348.)  Smoot told Hershey she was being stricter with D.L.J., and he was struggling with that.  (*Id.*)  Smoot reported D.L.J. had been "mischievous last year," but this year it was worse.  (*Id.*)  Smoot told Hershey D.L.J. reported being bullied, but Smoot wasn't sure he was actually being bullied.  (*Id.* at 349.)  D.L.J. excelled at Legos and was good at math and writing.  (*Id.*)  Smoot reported D.L.J. was capable of performing self-care and independently taking care of his basic needs, but that he does not do it.  (*Id.* at 350.)  Smoot

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The Court did not consider the evidence post-dating the ALJ's decision cited in Plaintiff's brief.  (Doc. No. 10 at 14-15.)  The Sixth **Error! Main Document Only.**Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

2

needed to walk him through everything he must do and provide constant reminders, as D.L.J. would forget what Smoot told him.  (*Id.*)  Smoot denied D.L.J had ever wet the bed or soiled his clothes.  (*Id.* at 351.) While D.L.J. struggled with his behaviors at school, Smoot reported his behaviors at home were not as bad, although he questioned things and did not seem to understand that Smoot was the adult.  (*Id.* at 352.) On examination, Hershey found full orientation, clean appearance, alert consciousness, good eye contact, fair concentration, normal motor activity, normal speech, intact memory, appropriate affect, euthymic mood, cooperative attitude, logical thought process, appropriate thought content, limited judgment and impulse control, and poor insight.  (*Id.* at 354.)  Hershey determined D.L.J. was "exhibiting symptoms at this time that evidence poor focus and concentration, defiance at home with mother, behavioral concerns at school, and these symptoms have worsened since the CLs father was arrested again and mom decided to become more strict at home and not giving into him as much."  (*Id.* at 356.)  Hershey opined D.L.J. would benefit from working with a school therapist on his behaviors and learning coping skills.  (*Id.*)  Hershey diagnosed D.L.J. with adjustment disorder with disturbance of conduct.  (*Id.*)

On July 2, 2019, D.L.J. saw Jessica Jarvis, LSW, for a therapy session during summer school.  (*Id.* at 411.)  D.L.J.'s teacher reported that over the past week, D.L.J. had "struggled every day with following basic directions and doing what he is told."  (*Id.*)  During the session, Jarvis showed a video on following directions; D.L.J. tried to ask questions throughout the video and Jarvis needed to redirect him so he could focus on the video.  (*Id.*)  On examination, Jarvis found symptoms of irritability and impatience, an irritable mood, and a full range of affect.  (*Id.*)  Jarvis noted "[s]low progress."  (*Id.*)

On July 11, 2019, D.L.J. saw Jarvis for follow up.  (*Id.* at 409.)  Jarvis asked D.L.J. about his week, as well as his behaviors at summer school, daycare, and home.  (*Id.*)  Jarvis noted she "had to redirect client throughout conversation as he tried to discuss other situations and blame peers for his behaviors."  (*Id.*)  Jarvis showed a progressive muscle relaxation video, during which she had to redirect

D.L.J. so he could remain focused and follow the directions in the video.  (*Id.*)  On examination, Jarvis found symptoms of irritability and an irritable mood.  (*Id.*)  Jarvis noted "[s]low progress."  (*Id.*)

On July 18, 2019, D.L.J. saw Jarvis for follow up.  (*Id.* at 407.)  Jarvis noted D.L.J. had "struggled this summer with following directions and getting along with other kids," which had been issues at both summer school and daycare.  (*Id.*)  During the session, Jarvis asked D.L.J. questions about his week and how he had been doing.  (*Id.*)  Jarvis noted that while D.L.J. "was able to respond with appropriate communication," he was "also off topic and jumped from one situation to another without processing or discussing it further."  (*Id.*)  Since D.L.J. continued to struggle, Jarvis engaged him in a therapeutic game.  (*Id.*)  On examination, Jarvis found symptoms of irritability and an irritable mood.  (*Id.*)  Jarvis noted "[s]low progress."  (*Id.*)

On July 23, 2019, D.L.J. saw Jarvis for follow up.  (*Id.* at 405.)  Jarvis noted he appeared upset at the beginning of the session, so she asked him open ended questions.  (*Id.*)  When D.L.J. continued to seem upset during conversation, Jarvis attempted to use a relaxation video, but D.L.J. was too distracted to get through it.  (*Id.*)  Jarvis noted D.L.J. struggled to stay on task.  (*Id.*)  On examination, Jarvis found symptoms of irritability and an irritable mood.  (*Id.*)  Jarvis noted "[s]low progress."  (*Id.*)

On September 26, 2019, Smoot and D.L.J saw Carrie Lemaster, QMHS, BA, for a therapy session.  (*Id.* at 396.)  Lemaster noted D.L.J. was running around during the session, and she assisted Smoot with correcting him.  (*Id.*)  Smoot reported she wanted D.L.J. to get an IEP and help as soon as possible, although she had seen an improvement with D.L.J. being at a new school.  (*Id.*)  Lemaster noted D.L.J. had increased energy and appeared to have a neutral mood and affect.  (*Id.*)

On October 3, 2019, D.L.J. saw Lemaster for follow up.  (*Id.* at 394.)  Lemaster noted D.L.J. was not focused in class, and she had to redirect him several times.  (*Id.*)  D.L.J. was able to complete his assignment and was told to get his snack.  (*Id.*)  At that time, a peer went over to D.L.J. and the two engaged in horse

play.  (*Id.*)  D.L.J. sat down when Lemaster redirected him, but he "struggled with sitting in his chair" and had a hard time eating his snack.  (*Id.*)  D.L.J. seemed to get upset when he had to stop eating his snack and go to the Bookmobile, and Lemaster had to redirect D.L.J. to stand in line and remember the rules.  (*Id.*)  Lemaster noted that while D.L.J. was in line and in the hallway, he could not stop talking, he kept turning around, and he and another peer were stepping on each other's feet.  (*Id.*)  D.L.J.'s teacher also reported concerns with his behavior at Mass.  (*Id.*)  D.L.J. told Lemaster he got along with everyone except for one person.  (*Id.*)  On examination, Lemaster found increased energy, anxiety, hypomanic mood, and neutral affect.  (*Id.* at 394-95.)  Lemaster noted slow progress.  (*Id.* at 395.)

Throughout the remainder of October 2019, Lemaster noted consistent issues with failure to follow directions and defiance, and the need for frequent redirection.  (*Id.* at 382-93.)  On October 10, 2019, D.L.J. was sent to the principal's office for being defiant, making noises, arguing, bothering others, and throwing erasers at a peer.  (*Id.* at 390.)  On October 17, 2019, Lemaster noted D.L.J. struggled in class so much that the teacher had moved him away from his peers because he was bothering others with the noises he was making.  (*Id.* at 386.)  On October 31, 2019, D.L.J. reported he got into trouble the day before because he was rolling on the floor after he on gray, and then he got in even more trouble because he was angry.  (*Id.* at 382.)  On examination, Lemaster consistently found increased energy, hypomanic mood, neutral affect, and slow progress.  (*Id.* at 382-93.)

In early November 2019, Lemaster continued to note consistent issues with failure to follow directions and defiance, and the need for frequent redirection.  (*Id.* at 376-81.)  On November 5, 2019, Lemaster noted D.L.J. had gotten into trouble because he had punched someone in the face for the second time in a few weeks.  (*Id.* at 380.)  D.L.J. had been clipped down to red that day, would not sit, listen, focus, or follow directions, struggled with personal space, yelled at his peers, and argued with Lemaster about the rules.  (*Id.*)  Lemaster noted the principal told Smoot that if D.L.J. did not get his behavior under

control soon, this school was not the place for him.  (*Id.*)  Lemaster continued to find increased energy, anxiety, irritability, hypomanic mood, and slow progress.  (*Id.* at 376-81.)

On November 13, 2019, D.L.J. saw Vincent Yu Han Lee, M.D., for follow up regarding his behavioral issues.  (*Id.* at 421-22.)  Dr. Lee noted D.L.J. was struggling a lot at school and had "possible disruptive behaviors," and Smoot reported D.L.J. might be getting kicked out of school soon.  (*Id.* at 422.)  Smoot told Dr. Lee D.L.J. was in the process of getting an IEP.  (*Id.*)  Dr. Lee noted he had reviewed the Vanderbilt forms the school had completed.  (*Id.*)  Based on the forms, Dr. Lee determined D.L.J. "likely ha[d] ADHD," and noted there was some concern of ODD.  (*Id.* at 423.)  Dr. Lee started D.L.J. on Ritalin that day so D.L.J. would not be expelled from school, but Dr. Lee emphasized the importance of follow up with Child Adolescent as well.  (*Id.*)

D.L.J. continued to see Lemaster through November and into December 2019.  (*Id.* at 366-73.)  On November 21, 2019, Lemaster noted D.L.J. had a good morning, although he was having an inappropriate conversation with his peers at lunch and his peers were getting upset.  (*Id.* at 372.)  On examination, Lemaster found increased energy and a neutral mood and affect.  (*Id.*)  On November 27, 2019, Lemaster noted D.L.J. was doing "fairly well" that day and noted he was currently on medication.  (*Id.* at 370.)  While gym class previously had been an issue for D.L.J., Lemaster noted he stopped talking when asked and was able to follow directions with only a couple of redirects.  (*Id.*)  D.L.J.'s teacher felt he was doing better, although he still had his moments, and wanted to see how it went until Christmas.  (*Id.*)  On December 3, 2019, Lemaster noted that while D.L.J. started out doing well, he got distracted at times, clipped down once before pulling it together as best he could, got distracted and began acting out when another class came in, and later began being silly and making noises.  (*Id.* at 368.)  Lemaster further noted D.L.J. had trouble sitting still that afternoon and that it appeared his medication had worn off.  (*Id.*)  On examination, Lemaster found increased energy, impatience, hypomanic mood, and neutral affect.  (*Id.*)

On December 9, 2019, Lemaster noted D.L.J. was having a good day, and he was excited about it.  (*Id.* at 366.)  On examination, Lemaster found increased energy, anxiety, hypomanic mood, and neutral affect.  (*Id.*)  Lemaster continued to find slow progress.  (*Id.* at 368-73.)

On December 11, 2019, D.L.J. saw Dr. Lee for follow up.  (*Id.* at 419.)  Smoot reported D.L.J. was tolerating his medication well, and "she has noticed some improvement and some not so much."  (*Id.* at 420.)  Smoot told Dr. Lee she thought the medication was wearing off early as D.L.J. did get defiant again and struggled at daycare in the afternoon.  (*Id.*)  Dr. Lee added an afternoon dose of Ritalin.  (*Id.*)

D.L.J. continued to see Lemaster at school.  (*Id.* at 362-65.)  On December 12, 2019, Lemaster noted D.L.J. was on medication, although it was a low dose, and Smoot told D.L.J.'S teacher that she wanted him to have another pill at lunch.  (*Id.* at 364.)  On that day, Lemaster found D.L.J. somewhat on task, but he got distracted quite a bit by his peers and needed redirection several times.  (*Id.*)  Lemaster noted D.L.J. seemed better until transitions, and then he was not nice to peers.  (*Id.*)  On examination, Lemaster found increased energy, irritability, hypomanic and irritable mood, and neutral affect.  (*Id.* at 365.)  On December 17, 2019, Lemaster noted that D.L.J. seemed able to focus more and follow directions now that he was taking his medication twice a day.  (*Id.* at 362.)  D.L.J. had his seat moved towards the front and was with the rest of the class.  (*Id.*)  D.L.J. told Lemaster how excited he was to have recess every day and be with the rest of the class.  (*Id.*)  D.L.J.'s teacher stated Smoot told her that she understood the difference when D.L.J. was not on medication, and that Smoot was on board with D.L.J. being on medication now.  (*Id.*)  On examination, Lemaster found neutral mood and affect.  (*Id.* at 363.)

A report card for second quarter of the 2019-2020 school year, dated January 15, 2020, showed improvement from first quarter but D.L.J. still had several areas marked "not yet developed" ("Student is showing limited evidence and progress toward meeting the grade level standard expectation even with [] guidance and support") in language arts and mathematics.  (*Id.* at 436-39.)  D.L.J.'s teacher noted she had

"seen a slight improvement" in his ability to stay focused and follow directions.  (*Id.* at 439.)

On January 21, 2020, D.L.J. saw Dr. Lee for follow up.  (*Id.* at 417.)  Smoot showed Dr. Lee D.L.J.'s report card.  (*Id.* at 418.)  Dr. Lee noted D.L.J.'s report cards were improving, as was his reading level, although Smoot still had concerns about D.L.J.'s behavior and had an appointment with a child adolescent psychologist on February 18, 2020.  (*Id.*)  Dr. Lee continued D.L.J.'s current dose of medication. (*Id.*)

On February 6, 2020, D.L.J.'s principal, Marcella Watry, completed a Speech/Language Questionnaire.  (*Id.* at 429-31.)  Watry reported she could understand 20% of D.L.J.'s conversational speech on the first attempt, and 80% after repetition.  (*Id.* at 429.)  Watry estimated an unfamiliar listener would be able to understand 20% of D.L.J.'s speech on the first attempt.  (*Id.*)  Watry noted D.L.J. exhibited secondary behaviors such as excessive eye blinking, grimacing while speaking, etc.  (*Id.* at 430.)  Watry reported D.L.J. "frequently" had difficulty in the following areas: following single-step verbal instructions; following multi-step verbal instructions; answering questions about a read-aloud story; following a classroom discussion; talking about past events; and following verbal instructions competently without looking to see what others are doing.  (*Id.* at 430.)  Watry explained D.L.J. struggled with telling stories, expressing his feelings, understanding verbal directions, retaining multi-step problems, taking turns, and listening to others.  (*Id.* at 431.)

That same day, Watry and D.L.J.'s teacher, Jennifer Kuberry, competed a Child Function Report. (*Id.* at 290-96.)  In the domain of acquiring and using information, Watry and Kuberry rated D.L.J. as having "a very serious problem" in the following areas: comprehending and doing math problems; understanding and participating in class discussions; providing oral explanations and adequate descriptions; expressing ideas in written form; and applying problem-solving skills in class discussions. (*Id.* at 290.)  They rated D.L.J. as having "a serious problem" in the following areas: comprehending oral

8

instructions; reading and comprehending written material; and recalling and applying previously learned material.  (*Id.*)  Watry and Kuberry reported D.L.J. needed constant support by an adult, he did not do any work on his own, and an aide had been working with him.  (*Id.*)

In the domain of attending and completing tasks, Watry and Kuberry opined D.L.J. had "a very serious problem" in the following areas with the accompanying frequency of the problem: paying attention when spoken to directly (hourly); focusing long enough to finish assigned activity or task (hourly); refocusing to task when necessary (hourly); carrying out multi-step instructions (hourly); completing work accurately without careless mistakes (hourly); and working at a reasonable pace/finishing on time (hourly).  (*Id.* at 291.)  They further opined D.L.J. had "a serious problem" in the following areas with the accompanying frequency of the problem: sustaining attention during play/sports activities (weekly); waiting to take turns (daily); changing from one activity to another without being disruptive (daily); completing class/homework assignments (daily); and working without distracting self or others (hourly).  (*Id.*)  Watry and Kuberry reported D.L.J. needed help with all activities and received help from the teacher or aide to complete tasks.  (*Id.*)

In the domain of interacting and relating with others, Watry and Kuberry opined D.L.J. had "a very serious problem" in the following areas with the accompanying frequency of the problem: seeking attention appropriately (hourly); respecting/obeying adults in authority (hourly); and relating experiences and telling stories (hourly).  (*Id.* at 292.)  They further opined D.L.J. had "a serious problem" in the following areas with the accompanying frequency of the problem: asking permission appropriately (hourly); following rules (classroom, games, sports) (hourly); introducing and maintaining relevant and appropriate topics of conversation (hourly); interpreting meaning of facial expression, body language, hints, sarcasm (hourly); and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation (hourly).  (*Id.*)  Watry and Kuberry explained they have needed to implement

9

behavior modification strategies for D.L.J., including a teacher aide to help redirect him and removal from the classroom.  (*Id.*)  They noted D.L.J. had an aide for half the day and he needed "constant redirecting to improve his focus on the assignment or task."  (*Id.*)

In the domain of moving about and manipulating objects, Watry and Kuberry did not identify any issues.  (*Id.* at 293.)  In the domain of caring for himself, Watry and Kuberry did not note any serious or very serious problems.  (*Id.* at 294.)

Watry and Kuberry reported D.L.J.'s functioning improved with medication, he had been on medication for approximately two months, and they had seen some improvement.  (*Id.* at 295.)

On February 18, 2020, D.L.J. saw Craig King, APRN, for psychiatric treatment.  (*Id.* at 481.)  Smoot reported D.L.J.'s medication helped at school, but he was "'really irritable in the afternoon.'"  (*Id.*)  Smoot told King that since starting Ritalin, D.L.J. had "great irritability," a tearful affect, and "'a really bad attitude'" in the afternoons that was triggered by having to complete or work on homework.  (*Id.*)  Smoot told King D.L.J.'s teachers were "ecstatic" about D.L.J.'s medication since he could function better at school, although he still struggled with grades, focus, and getting things done.  (*Id.*)  D.L.J's impulse control had also improved on medication.  (*Id.*)  Smoot reported D.L.J. had a poor memory and a lack of awareness of his condition.  (*Id.*)  King noted D.L.J.'s reading was at pre-kindergarten levels and his math was at grade level.  (*Id.*)  On examination, King found D.L.J. appropriately dressed and causally groomed, with full orientation, normal alertness, fair eye contact, normal speech, hyperactive, quiet, and cooperative behavior, tangential thought processes, occasionally loose associations, tangential stream of thought, good mood, congruent affect, limited fund of knowledge, good memory, limited insight, good judgment, and poor concentration.  (*Id.* at 484.)  King stopped Ritalin and prescribed Vyvanse.  (*Id.* at 485.)

On March 17, 2020, D.L.J. saw King for follow up.  (*Id.* at 486.)  Smoot reported that since switching to Vyvanse, it was like D.L.J. was no longer on medication.  (*Id.*)  D.L.J.'s teachers felt the

same way.  (*Id.*)  Smoot endorsed hyperactivity, trouble listening, not listening at school, and not finishing work.  (*Id.*)  These symptoms were constant throughout the day.  (*Id.*)  Smoot told King she thought she may have been wrong in saying that after starting Ritalin, D.L.J.'s irritability was worse in the afternoon now that D.L.J. was acting as if he was not on medication at all.  (*Id.*)  On examination, King found D.L.J. appropriately dressed and well-groomed, with full orientation, normal alertness, good eye contact, normal speech, quiet, cooperative, and hyperactive behavior, logical thought process, logical associations, unremarkable stream of thought, good mood, and congruent affect.  (*Id.* at 488.)  King increased the dosage of Vyvanse.  (*Id.* at 489.)

On April 14, 2020, D.L.J. saw King for follow up by telephone due to COVID-19.  (*Id.* at 490.) Smoot and D.L.J.'S grandmother reported that his focus and hyperactivity had been a little better, although he was "still very fidgety" when doing schoolwork and "very easily distracted."  (*Id.*)  Both felt D.L.J.'s irritability had improved a bit as well.  (*Id.*)  They reported D.L.J. was acting like a little child with his younger brother since he was home with him more.  (*Id.*)  Both reported D.L.J.'s medication lasted until 2-3 p.m.  (*Id.*)  On examination, King found full orientation, normal alertness, normal speech, quiet, cooperative, and calm behavior, logical thought processes, logical associations, unremarkable stream of thought, good mood, and congruent affect.  (*Id.* at 492.)  King noted progress had been made with the treatment plan, so medications were not changed.  (*Id.*)

On May 12, 2020, D.L.J. saw King for follow up by telephone due to COVID-19.  (*Id.* at 494.) Smoot declined a Zoom appointment.  (*Id.*)  Smoot reported D.L.J.'s ADHD and focus had improved since increasing Vyvanse to 40 mg, and the medication was lasting until 7 p.m.  (*Id.*)  Smoot told King D.L.J.'s attitude had been worse in the past month, and the only things that have changed were his medication and he was watching more YouTube.  (*Id.*)  Smoot was not sure the medication was causing the problem with D.L.J.'s attitude.  (*Id.*)  On examination, King found full orientation, normal alertness,

11

normal speech, quiet, cooperative, and calm behavior, logical thought processes, logical associations, unremarkable stream of thought, good mood, and congruent affect. (*Id.* at 496.) King again noted progress had been made with the treatment plan and medications were not changed. (*Id.*)

On July 16, 2020, D.L.J. saw speech-language pathologist Noel Smith, MCD, CCC-SLP, for a speech language evaluation. (*Id.* at 446-49.) Smoot reported D.L.J. had a 504 Plan at school and had some difficulty with academic performance, particularly reading. (*Id.* at 447.) Smoot also expressed some concerns with D.L.J.'s social skills. (*Id.*) Upon testing, D.L.J.'s oral composite score was in the 5th percentile, his listening comprehension was in the 4th percentile, and his oral expression was in the 10th percentile. (*Id.*) Smith noted that while at times D.L.J. had "some slight difficulty attending to tasks," with some prompting and redirection he was able to improve his focus and attention and complete tasks. (*Id.*) Smith opined D.L.J.'s language skills were below average, and he would benefit from speech therapy services. (*Id.* at 448.) Smith reported D.L.J. "may have a difficult time understanding information that others share," he "would benefit from directions/instructions that is both repeated and broken down into steps," and during instruction, his teachers should frequently check for comprehension to make sure D.L.J. had "a good understanding of information being presented to him." (*Id.* at 446.)

On July 21, 2020, D.L.J. saw Bryan Krabbe, Psy.D., for a consultative psychiatric examination. (*Id.* at 467-72.) Smoot reported seeking benefits because of D.L.J.'s ADHD. (*Id.* at 467.) Smoot told Dr. Krabbe D.L.J. had a history of delays with crawling, walking, and speaking. (*Id.* at 468.) Smoot reported D.L.J. had a 504 Plan at school for learning and behavior, he had not repeated a grade, his report cards consisted mostly of "not yet developed" grades, he had problems focusing in school, he talked back to teachers, he was ridiculed by his peers, and he had disciplinary problems at school for not following instructions, swinging from the curtains, acting out, and disrupting class. (*Id.*) Smoot told Dr. Krabbe D.L.J. was testing at a pre-kindergarten level, he had difficulty talking, he talked to strangers, he did not

12

comprehend things, he acted out, his speech therapist said he might have autism, he fidgeted and did not make eye contact, he lost things, he had problems with bowel movements, he was very talkative, he cried and was overly emotional, he needed help with showering and dressing, he did not respect adults, and he had trouble staying focused in school and distracted the class.  (*Id.* at 468-69.)  Smoot endorsed carelessness with frequent mistakes, poor attention and concentration, not listening when spoken to directly, lacking follow through when instructed, being disorganized and messy, being forgetful, frequently losing things, being easily distracted, being fidgety, always on the go, talkative, and impulsive, frequently interrupting others, having frequent tantrums, being sensitive to rejection, being socially withdrawn, having difficulty concentrating, having insomnia, having anger outbursts, and being restless. (*Id.* at 469.)  Smoot also reported sleep problems.  (*Id.*)  D.L.J reported he liked to play Roblox, swim, and go go-carting.  (*Id.*)

Dr. Krabbe noted D.L.J. sat quietly in the lobby, while he was fidgety and made silly faces in the office, although he stayed seated in his chair.  (*Id.*)  Dr. Krabbe found him cooperative and appropriately engaged in the evaluation.  (*Id.*)  On examination, Dr. Krabbe found normal conversational speed, 100% intelligible articulation, adequate receptive language skills, clear and logical thought processes, and age-appropriate attention.  (*Id.*)  Dr. Krabbe noted D.L.J. obeyed him and Smoot when he was given a directive.  (*Id.*)  Dr. Krabbe reported D.L.J. was unable to do the following age-appropriate things:

- State the day of the week.

- State the city where he was located.

- Name several colors of the rainbow.

- Name the month that comes after March.

- Name the four seasons of the year.

- State how many items made a dozen.

13

- State how many days were in a year.

- Perform basic subtraction.

- Perform basic multiplication.

- Perform basic division.

(*Id.* at 470.)  D.L.J. recalled five digits forward and three backward, counted backwards from 20 to 1 in six seconds with one error, and recited the alphabet in five seconds with no errors.  (*Id.*)  Dr. Krabbe determined D.L.J. "likely functioned below normal limits of mental status."  (*Id.*)  Dr. Krabbe diagnosed D.L.J. with unspecified attention-deficit/hyperactivity disorder.  (*Id.* at 471.)  Dr. Krabbe opined D.L.J.'s weaknesses in both verbal and non-verbal reasoning skills "would lead to difficulty acquiring new information," although D.L.J. did not display problems with distraction during the evaluation and he was able to converse in an age-appropriate manner during the evaluation.  (*Id.*)  Dr. Krabbe further opined D.L.J. demonstrated "effective task persistence when answering questions" and he "had no difficulty following directions."  (*Id.*)  While D.L.J.'s "[s]ymptoms of impulsivity and inattentiveness may interfere with [his] ability to get along with others," he "presented with adequate levels of intellectual functioning to understand and respond to others."  (*Id.* at 472.)  Dr. Krabbe stated D.L.J. had less than age-appropriate management of self-care and ability to regulate his emotions.  (*Id.*)

On August 19, 2020, D.L.J. saw Linda Erb, OTR/L, for an occupational therapy evaluation.  (*Id.* at 516-23.)  Smoot told Erb D.L.J. had a diagnosis of ADHD, although she was not ready to pursue medication, and that D.L.J. had difficulties at school and tested below grade level but he only had a 504 Plan so far.  (*Id.* at 516.)  Erb found D.L.J. "pleasant and cooperative through out the assessment," and while he "engaged in task avoidance behaviors" like off-topic conversation or suggesting a different activity when tasks were more difficult, he redirected well with support.  (*Id.* at 517.)  On examination, Erb found abnormal upper body strength with decreased endurance for sustained strength activities,

14

abnormal balance, and abnormal grasping skills with decreased strength.  (*Id.*)  Erb further found abnormal pre-writing/writing skills, with lack of visual motor skills to write with accurate spacing, limited immediate recall of letter formation, difficulty remembering proper spelling, even for his middle and last names, and limited visual scanning.  (*Id.* at 518.)  Erb also found abnormal cutting skills, bilateral coordination, attention to task, and sensory processing.  (*Id.*)  Erb stated that D.L.J. could complete isolated tasks, but he struggled to complete daily living routines independently.  (*Id.* at 520.)  Erb opined that D.L.J. "presents with below average visual motor, motor coordination, and dexterity skills resulting in functional delays in daily living and academic tasks.  He has limited self regulation skills resulting in negative behaviors as a way to cope with his difficulty."  (*Id.* at 522.)  Erb recommended skilled occupational therapy one a week.  (*Id.*)

That same day, D.L.J. saw Caren Lennon Ream, APRN, by telephone for ADHD follow up and medication management.  (*Id.* at 506.)  Smoot told Lennon Ream that D.L.J. would be doing online school and would be in special education; while he had a 504 Plan, Smoot was trying to get him an IEP.  (*Id.*)  Smoot denied any problems with aggression, tantrums, or defiance, reported D.L.J. had not gotten into any major trouble, his mood was fine, and his appetite was good.  (*Id.*)  Smoot told Lennon Ream she was happy with D.L.J.'s medication.  (*Id.*)  On examination, Lennon Ream found full orientation, normal alertness, normal speech, talkative behavior, logical thought processes, logical associations, unremarkable stream of thought, elevated mood, appropriate affect, good memory, good insight, fair judgment, and fair concentration.  (*Id.* at 508.)

On September 10, 2020, D.L.J. saw Christina Pierko, M.A., CCC-SLP, for a speech-language evaluation.  (*Id.* at 524-28.)  Pierko noted D.L.J. had ADHD, for which he took medication daily, and he enjoyed math and playing Roblox.  (*Id.* at 525.)  On examination, Pierko found D.L.J.'s Receptive Language Index and Expressive Language Index scores showed his listening and auditory comprehension

skills, as well as his verbal language skills, were within the low average range.  (*Id.* at 526.)  Pierko noted D.L.J. always maintained appropriate eye contact during the evaluation and that he was able to maintain a conversation.  (*Id.* at 527.)  Pierko opined D.L.J. presented "with an average receptive language and mild expressive language disorder which interferes with his ability to understand and express his wants/needs/ideas in daily functional/social/educational activities."  (*Id.*)  Pierko recommended weekly half hour speech therapy sessions to develop D.L.J.'s communication skills.  (*Id.*)

On August 28, 2020, and October 28, 2020, D.L.J. saw Hal Wildman, Ph.D., for psychological evaluation.  (*Id.* at 529.)  Smoot reported cooperation was an issue with D.L.J., he had a history of not following directions at school and having tantrums when asked to do homework, and that he was not bowel trained.  (*Id.* at 530.)  Smoot told Dr. Wildman she had asked for an evaluation to determine whether D.L.J. qualifies for an IEP, but his school had declined to perform the evaluation.  (*Id.* at 531.)  D.LJ. did have a 504 Plan.  (*Id.*)  Dr. Wildman determined that the data obtained during the evaluation supported an autism spectrum disorder diagnosis, and the results of the ADI-R supported that diagnosis.  (*Id.* at 536.)  Dr. Wildman diagnosed D.L.J. with autism spectrum disorder without evidence of accompanying intellectual impairment, but with accompanying language impairment, requiring support in the areas of social communication and restricted, repetitive behaviors, ADHD, combined presentation, and oppositional defiance disorder, moderate.  (*Id.*)  Dr. Wildman stated that D.L.J. needed a "school multifactored evaluation to determine whether he qualifies for special education services under the category of Autism or the category of Other Health Impairment (Minor)."  (*Id.* at 537.)

An Alliance City Schools Evaluation Team Report completed in February 2021 consisted of the individual evaluators' assessments and documentation for determining the existence of a specific learning disability, including the testing outlined above.  (*Id.* at 539-73.)  The team members consisted of Smoot, D.L.J., a school psychologist, D.L.J.'s teacher, an intervention specialist, a district representative, a speech

16

and language pathologist, and an occupational therapist. (*Id.* at 540.) Speech-language pathologist Amy Capeta reported that D.L.J.'s receptive language score was in the average range and his expressive language score showed mild delay/impairment. (*Id.* at 542.) Capeta noted D.L.J. took his shoes off during testing, had to be asked several times to put a deck of cards down, needed multiple cues to remain on task, and seemed to prefer doing things his own way rather than as he had been instructed. (*Id.* at 543.) D.L.J. was attentive during testing, although he liked to answer questions and participate his way instead of following directions. (*Id.*) Capeta reported D.L.J.'s testing results "indicate that [his] overall language skills fall in the below average range (it should be noted that his standard score falls one point below that which is considered average)" and that his "understanding and use of language both fall within the average range when compared with peers." (*Id.*) Capeta opined:

> Based on testing, observation, and teacher report, [D.L.J.]'s language skills do not pose a barrier to him accessing the general education curriculum. [D.L.J.] does have difficulty following directions when given, however, this seems to be based on his desire to complete tasks his desired way as compared with as instructed (not his inability to understand the direction). He may benefit from visual and verbal cues to complete tasks as instructed with positive and negative reinforcement provided as necessary to increase his correct participation.

(*Id.* at 544.) Capeta further opined D.L.J.'s progress could "be indirectly monitored by the general education teacher within the classroom." (*Id.*)

Occupational therapist Jeannette Hart noted that during assessment, D.L.J. required verbal cues to stop and listen, and sometimes have supplies taken away, in order to listen to instructions before all tasks. (*Id.* at 545, 547.) Hart stated D.L.J. seemed to enjoy all the activities and he was redirectable. (*Id.* at 547.) Hart noted D.L.J. required cues to use his right hand to stabilize his paper, often did not follow instructions, and had to be told to stop and retry several tests during one portion of the assessment. (*Id.*) Hart stated that during all tasks, D.L.J.'s shoes were off, and he moved in his seat "constantly." (*Id.*) Hart opined:

[D.L.J.] demonstrates strong fine motor skills. He is able to write legibly however due to spacing difficulties his handwriting is difficult to read. He works when told to do an assessment task however he has difficulty waiting for the full direction to be given and often impulsively does the task as he wants to do it. Sensory information from parent and teacher is very similar. [D.L.J.] requires significantly more movement, with his body and his hands than his peers. He has increased sensitivity to noise, and is a picky eater. [D.L.J.] does require extra support for learning. These findings appear to be linked to his difficulties attending in class, maintaining organization and providing quality work. If [D.L.J.] becomes overwhelmed with the work or sensory input he might "shut down" and avoid the work all together rather than seek solutions.

* * *

Sensory difficulties indicate [D.L.J.]'s need for a quiet, low distraction learning environment, extra movement breaks, and possibly quiet fidgets available in order to continue learning in the school environment. Progress monitoring may be competed [sic] by the general education teacher as he continues to gain and develop handwriting skills through observations and quarterly progress reports.

(*Id.* at 548.)

School psychologist Rachel Duck, Ed. S., NCSP, noted there were no current concerns with D.L.J.'s attendance or behavior incidents at school. (*Id.* at 550-51.) Duck reported that D.L.J.'s "FSIQ score, a measure of overall intellectual ability, was in the Very Low range compared to other children who are 8 years and 9 months old (FSIQ = 74)," but that his score "should be interpreted with caution due to the large degree of scatter across [D.L.J.]'s cognitive composites and behavior during testing . . . ." (*Id.* at 552.) Duck noted that during assessment, D.L.J. "required several prompts to focus, listen to directions, stop his impulses, and have 'quiet hands.'" (*Id.*) Duck further noted D.L.J. was "very active and talkative," and that when he wanted to avoid a task, D.L.J. "would whine, pout, tantrum, and talk like a baby." (*Id.* at 552-53.) Duck observed D.L.J. was fidgeting, in constant motion, and spinning on his chair, and he "often needed prompts to try and attempt items." (*Id.* at 553.) During testing, D.L.J. told Duck he was not giving it his best effort. (*Id.*) D.L.J.'s full-scale IQ fell within the average range. (*Id.* at 554.) Duck reported:

> Given cognitive assessment results, [D.L.J.] will likely need items repeated and cues for attention . . . Although scores are well below the average range from the first assessment, this is likely due to task refusal and behaviors during testing.  The second assessment and testing session revealed much improvement in behavior yielding higher cognitive scores for [D.L.J.].

(*Id.* at 554.)  Duck noted D.L.J.'s behavior improved beginning in January 2020 when he started taking ADHD medication, and his misbehavior began again in February 2020 when he was not taking his ADHD medication consistently.  (*Id.* at 555.)  According to Duck, D.L.J.'s academic performance fell in the average range when he attempted problems and tasks, and that based on observed testing behaviors, D.L.J.'s academic range fell well below average when he did not attempt problems because of his behavior, not a lack of skill.  (*Id.* at 558.)  Duck noted D.L.J. had "not been involved in the Response to Intervention process during his 2nd or 3rd grade school years due to his performance and rate of learning being commensurate with peers," and although D.L.J. "had some behavioral concerns in the classroom, these were able to be managed within the general education setting."  (*Id.*)  Based on her own classroom observations, Duck reported D.L.J. had "difficulty sustaining attention to work and complete tasks," was "often distracted by himself, his pencil, and looking out the window," engaged in behavior to gain attention from peers, and engaged in behavior different from his peers' behavior at the time.  (*Id.* at 567.)  Duck opined:

> Results of the current evaluation indicate there are no educationally relevant needs in the areas of general intelligence, academic skills, or behavior.  [D.L.J.] has skills that are within the expected range in the areas of cognition and academics.
>
> In regards to behavior, [D.L.J.] may need prompts to attempt items, cues for attention, prompts to listen to directions, information repeated, reminders for "quiet hands", opportunities to have breaks, movement breaks, and the use of fidget tools.

(*Id.* at 568.)  Duck further opined that "[s]ervices provided to general education students will be sufficient to meet the needs of [D.L.J.]," and that progress monitoring would be recorded through classroom data, grades, and district diagnostic assessments.  (*Id.*)

19

**B.     State Agency Reports**

On July 24, 2020, Todd Finnerty, Psy.D., opined that D.L.J.'s impairments did not meet or medically equal any listed childhood impairment, nor did his impairments functionally equal any of the listings.  (*Id.* at 153-54.)  Dr. Finnerty further opined D.L.J. had less than marked limitations in the domains of acquiring and using information, interacting and relating with others, and caring for oneself, a marked limitation in the domain of attending and completing tasks, and no limitation in the domains of moving about and manipulating objects and health and physical well-being.  (*Id.*)

On August 24, 2020, on reconsideration, Paul Tangeman, Ph.D., affirmed Dr. Finnerty's findings, except Dr. Tangeman found a less than marked limitation in the domain of attending and completing tasks.  (*Id.* at 161-62.)

**C.     Hearing Testimony**

During the March 18, 2021 hearing, D.L.J. testified to the following:

- He is in third grade.  (*Id.* at 126.)  He likes his school.  (*Id.*)  His favorite subjects are gym and science.  (*Id.* at 127.)  He likes to go places and play games on the phone.  (*Id.*)  He likes to build with Legos.  (*Id.*)

During the March 18, 2021 hearing, Smoot testified to the following:

- D.L.J is a very loving boy, but he has a lot of challenges.  (*Id.* at 130.)  He throws tantrums when he does not get his way or is off his schedule.  (*Id.*)  He shuts down with any type of schedule change.  (*Id.*)  He does not understand communication and has a hard time with empathy.  (*Id.*)  He has a little opposite defiance disorder.  (*Id.*)  He cannot relay back language, and he struggles academically with reading and comprehension.  (*Id.* at 130-31.)  He still has problems with potty training, and frequently defecates himself.  (*Id.* at 131.)  She must wash him and help him brush his teeth.  (*Id.*)

- D.L.J was on medication, but when he was diagnosed with autism his treatment providers told her there was no medication for autism and took him off the medication.  (*Id.*)  She believed his medication was stopped in October or November of 2020.  (*Id.*)  The medication somewhat improved D.L.J.'s behavior and he was not shutting down as much.  (*Id.*)  She believed his behavior was the same, even with medication, because when he got home from school the medication would wear off

and he would be his normal self.  (*Id.* at 132.)  However, he was not throwing as many tantrums at school.  (*Id.*)

- Total Education Solutions recommended occupational therapy, speech therapy, behavior therapy, and counseling for D.L.J.'s autism.  (*Id.* at 134.)  D.L.J. was going, but then she started a new job and had to postpone his treatment.  (*Id.*)  They are getting ready to get D.L.J. back into therapies every two weeks.  (*Id.*)

- Because D.L.J. goes to a private school, the school just lists a 504 recommendation as special accommodations.  (*Id.* at 135.)  Last year, D.L.J. was considered immediate intervention and had somebody to help him.  (*Id.* at 136.)  He was doing online school at home from March 2020 until January 2021.  (*Id.* at 137.)  She still had concerns about COVID, but it was too much for her with D.L.J. doing online school at home.  (*Id.*)

- She tries to encourage chores, but D.L.J. won't do them, even when she tries to reward his behavior.  (*Id.*)  He has opposite defiance disorder, which causes him to shut down, break down, and throw tantrums.  (*Id.*)  He acts like any chore is the end of the world.  (*Id.*)  D.L.J. needs everything scheduled or consistent, and if anything goes off plan, his day is ruined.  (*Id.*)  He cannot sit still.  (*Id.*)  She tries to keep everything as consistent as she can for him.  (*Id.* at 137-38.)

- D.L.J. did have friends before COVID, although he constantly fought with them, even at school.  (*Id.* at 138.)  D.L.J. tells her kids are being mean to him, and it's hard for him to keep friends.  (*Id.* at 138-39.)  He has neighborhood friends, and he fights with them too.  (*Id.* at 139.)  He got into a physical altercation with a child at a park.  (*Id.*)  It is hard to let him be around other kids because he just fights with them for some reason.  (*Id.*)

### III.    STANDARD FOR DISABILITY

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act. "An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."

21

20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To receive SSI benefits, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme."  20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  20 C.F.R. § 416.926a(e)(3)(I).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent, of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant was born on April **, 2012.  Therefore, he was a school-age child on November 27, 2019, the date on which the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.  The claimant has not engaged in substantial gainful activity since November 27, 2019, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: attention-deficit hyperactivity disorder (ADHD), adjustment disorder with disturbance of conduct, expressive language delay, oppositional-defiant disorder (ODD), and autism spectrum disorder (ASD), Level 1 (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.  The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since November 27, 2019, the date on which the application was filed (20 CFR 416.924(a)).

(Tr. 95-115.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Smoot first argues that the evidence of record "highly support[s] at least a marked limitation" in the domain of acquiring and using information. (Doc. No. 10 at 18.) Smoot insists "that this argument is not asking for a reinterpretation of the evidence, but a proper evaluation of the evidence including the ALJ's improper rejection or failure to reconcile the opinion evidence in the file, the ALJ's mischaracterization of the record, and the fact the overwhelming evidence without question simply supports at least a marked limitation in this domain." (*Id.* at 18-19.) Smoot questions the ALJ's reliance on D.L.J.'s improvement with medication when the medication was stopped once D.L.J. was diagnosed with autism, and she accuses the ALJ of cherry-picking the findings in Dr. Krabbe's consultative psychiatric examination and misrepresenting that there were no significant educational interventions. (*Id.* at 21.) Relying on evidence post-dating the ALJ's decision, Smoot argues the ALJ "ignore[d] significant later evidence in the file" that post-dated the February 2021 Evaluation Team Report. (*Id.* at 22-23.) Smoot next argues that the evidence also supports a marked limitation in the domain of attending and completing tasks. (*Id.* at 23-27.) Smoot asserts that the reasoning of the ALJ "for crediting Dr. Tangeman

25

over Dr. Finnerty was invalid because it relied on the medication assumption which as discussed is improper," and further "relied on 'the new medical evidence available' up to the hearing" when the evaluations were only one month apart. (*Id.* at 25.) In addition, according to Smoot, "[t]he new evidence overwhelmingly supports a marked limitation domain, and the totality of the evidence from Claimant's classroom behavior described ad nauseum above shows a clearly marked limitation in attending and completing tasks." (*Id.*)

The Commissioner responds that while Smoot claims she is not asking the Court for a reinterpretation of the evidence, a review of her brief "makes clear that that is precisely what she is asking from the Court." (Doc. No. 11 at 1.) The ALJ considered all record evidence, including the subjective complaints, the objective evidence, and the opinion evidence, and the ALJ considered and discussed findings both supporting from and detracting from a disability finding, including the evidence highlighted by Smoot. (*Id.*) The Commissioner points out that the evidence on which Smoot relies in support of her accusation that the ALJ ignored and mischaracterized later evidence comes from the school year following the ALJ's decision, and that it went without saying that the ALJ could not have considered evidence post-dating the decision. (*Id.*)

In reply, Smoot takes issue with the Commissioner's brief regarding improvements with medication, arguing that the Commissioner "misses the point that the ALJ was actually privy to the fact Claimant was taken off the medication" and it is unclear why both the ALJ and the Commissioner "routinely cite to medication improvements when such medication is clearly off the table." (Doc. No. 12 at 1-2.)

Substantial evidence supports the ALJ's functional equivalence analysis. In analyzing the testimony of D.L.J. and Smoot, as well as the objective evidence in the record, the ALJ thoroughly discussed the evidence, including findings that both supported and undercut findings of disability. (Tr.

96-115.)  As Smoot acknowledges in her reply, the ALJ considered that D.L.J. had been taken off his medication when he was diagnosed with autism.  (*Id.* at 101.)  The state agency reviewing sources issued their opinions in July 2020 and August 2020.  (*Id.* at 150-56, 158-64.)  While Smoot argues the ALJ should have credited Dr. Finnerty's marked limitation in the domain of attending and completing tasks over Dr. Tangeman's less than marked limitation, it is the ALJ's duty – not this Court's – to weigh the evidence.  In addition, the ALJ considered the treatment records that post-dated the state agency reviewing sources' opinions.  (*Id.* at 101-02.)   A careful review of the decision reveals that the Evaluation Team Report from February 2021 played a significant role in the ALJ's ultimate findings (*id.* at 101-02, 106, 108-15), and again, it was the ALJ's responsibility to weigh the evidence.

At bottom, Smoot's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do.  While Smoot interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: January 31, 2023                         *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge

27